Thank you. You may be seated. Our first case for this afternoon is case number 415-0501, Stroman Realty v. Craig Allison et al., and we have the appellant present by Ms. Welsh, and then we have the appellee present by Ms. Powell. And did you want to introduce co-counsel, or? Mr. Earle. All right. Thank you. You may proceed, counsel. Good afternoon, Your Honors. May it please the Court, I'm Mary Welsh. I'm here on behalf of the defendants. Your Honors, in this case it's undisputed that the plaintiff sent direct mail solicitation into Illinois residents and also offered for sale timeshares that are either owned by Illinois residents or that are located in Illinois. And because neither of these findings is against the manifest way that the evidence are clearly erroneous, then the plaintiff doesn't argue that they are. Then the director's findings that the then that is dispositive on the plaintiff's arguments about or the claims as to the wholly extraterritorial application of Illinois law and also dispositive of part of its Commerce Clause claim. And in addition, of course, the commercial speech is this very speech, the direct solicitation by mail of Illinois residents and also the offering for sale of owned by Illinois residents. So again, Your Honor, normally these are, well, as we know, these are professional services contracts. And professional services contracts are performed are when you provide services nationwide, you provide them to the person where that person is. You don't, this is what Costell, for example, the Illinois Appellate Court's decision in Costell, Swanson, other cases when there's a difference between cases in which the person who is buying the services or buying a car or taking out a loan goes into another state to do so. That's Mills, for example, the Midwest Title Loan case and so on. When somebody, when an Indiana resident, for example, goes into Illinois and takes out a loan and everything occurs in Illinois, Indiana can't regulate that because that transaction happens wholly in Illinois and not in Indiana. And here things happen in different states, in several states, because this is a nationwide service, these brokerage services that the plaintiff provides. And so what happens here is that the plaintiff sends out direct mail solicitation to Illinois residents and then, and also does other kinds of advertising too on the web and so on. You'll do a Google search for timeshare resale, you'll come up with their name. But again, you know, the director said, we're not talking about, we're not wanting to regulate the website advertising of your services. We're saying we're regulating this direct mail solicitation to Illinois residents. And also, you know, Illinois is regulating the offering for sale of Illinois, timeshares located in Illinois or timeshares owned by Illinois residents only. So all of this other sort of clutter in the record doesn't really matter because what is important here is what is Illinois regulating. And what Illinois is regulating, again, is the direct mail solicitation for its services, you know, for timeshare services, timeshare brokerage services. And also, excuse me, the offering for sale of the timeshares that either are located in Illinois or belong to Illinois sellers. Now, and because we're, because Illinois is regulating only the actions that occur in Illinois, where the services are provided to Illinois residents or are provided for Illinois properties. I mean, surely nobody would think that Illinois cannot regulate the broker for the sale of my condo in Chicago, for example. And so that if I wanted to ask Stroman, if I wanted to ask Plaintiff to be my broker for my condo sale, that nobody would think twice about whether Illinois could in fact regulate, require licensing for their providing services to me in Chicago for that. Or even if I had already moved out of Chicago and had even moved to Texas, because the property is located in Illinois, the property at issue for which brokerage services are being provided, those services need to be regulated by the state of Illinois. Because Illinois has, you know, obviously a very significant interest in how real estate professionals deal with Illinois property. You know, every state has its own rules about property law, about disclosures, about, you know, what you need to tell a seller, what, you know, what the form maybe of the sale, the offer might be and so on. Property is an inherently state-centric property transactions, real property transactions are inherently state-centric. And in fact, I mean, we know that the transaction of the property itself is in trust state, right? Because property doesn't cross, real property doesn't cross state lines. Real property stays in the state where it is located. And so because of that, a sale of real property is itself in trust state. But what we're concerned about here is not the sale of the timeshares itself, but the sale of the brokerage activities and the brokerage activities themselves. And so again, what we're concerned about is the one who wants to give those, provide those services to someone who lives in Illinois or for an Illinois property. And then someone who offers for sale the property, a timeshare that belongs to someone in Illinois, an Illinois consumer, an Illinois seller or property that is in Illinois itself regardless of where the seller might be. So, and again, you know, there's absolutely no dispute. I mean, the plaintiff, you know, Mr. Sterlman himself testified, you know, we send direct mail everywhere. We get lists of people who own timeshares and we sell, you know, they don't do cold calls, but they do sort of cold mailings. They send direct mail to people who own timeshares and say, do you want, if you want to sell, we can provide you these brokerage services. We will take care of that for you. We will get your timeshare sold. And so, and then, you know, as the evidence showed, the nature of timeshare and even like real estate now, generally because people move so much, you know, the nature of the brokerage services are such that they might implicate three states. They might implicate, you know, the seller's state, the state of the timeshare and the buyer. But here where, you know, Illinois is concerned only about two things. They're concerned about direct mail advertising to Illinois residents and they're concerned about the, excuse me, the offering for sale of timeshares located in Illinois or owned by Illinois residents. And that's where the nexus is to Illinois. And that's why the Director's decision that plaintiff acted in Illinois, that, you know, acted as a timeshare resale agent in Illinois is manifestly correct. It's not against the manifest way of the evidence because, again, when you provide services as they did to Mr. Humphreys, for example, you know, they advised him how to set the asking price. They sent the contract into Illinois. Mr. Stroman himself agreed that the contracts that he sent to the Silverleaf developer were executed in Illinois and certainly Mr. Humphreys executed the contract by signing it in Illinois. All of these things took place in Illinois so there can't be a wholly extraterritorial effect of the Director's enforcement of the act against Stroman because Stroman is, acts as a nationwide, I mean, it admits it acts as a nationwide broker. And because it acts as a nationwide broker and provides nation services nationwide, it's just like the physicians and the lab in Costal. When you hold yourself out as a nationwide service provider and you provide services to people in other states, personal services to people in other states, those other states can regulate those services. And, you know, states have a substantial interest in regulating the professions. I mean, there can't be any dispute about that. And certainly in Martinez noted the Illinois Supreme Court's decision in Coldwell-Banker that Illinois has a very substantial compelling interest in regulating real estate profession in particular. Because again, real property is of high interest to the states and how real property is transferred is of real interest to the states. So, and also, no, unlike the Midwest title case and to get, you know, physically moves to Texas, travels to Texas to get these services from plaintiff. The, what happens is that the plaintiff injects itself into Illinois. Again, by direct mail solicitation and by offering services to people in Illinois. And the people in Illinois receive, are the recipients in Illinois of those services or again, the property is located in Illinois. There's, with regard to the commerce, the non-extraterritorial component of the plaintiff's claims, this is the Pike test. You know, in the Pike test, the plaintiff has the burden, not us, the plaintiff has the burden of showing that the regulations are clearly excessive in relation, the burden is clearly excessive in relation to the benefits that, and the governmental interest. Well, again, the governmental interest, the Illinois Supreme Court has held, the government has this compelling interest in regulating real estate professionals generally to protect consumers, to keep, you know, the profession integrity. There's, there can be no question that states have an interest, a very strong governmental interest in regulating the professions. And so the question is, what's the burden on the plaintiff? Well, the only burden for which the plaintiff gave actual evidence or for which there's any evidence in the record is that there's a, there was an initial $500 registration fee, then there was $250 a month, or sorry, a year to, you know, to re-up and then to take the licensing exam. But again, you know, taking, having to take an exam and paying a, you know, modest fee every year is not a substantial burden and it's certainly not clearly excessive in relation to the benefits to Illinois citizens and Illinois property transactions. And in addition, the, you know, this isn't like Pike. I mean, Pike, I think, is an excellent example of what is a substantial burden. And there, the burden was going to be that the plaintiff who was bulk transporting cantaloupes rather than packaging them in Arizona would have to, to comply with Arizona law, would have to build a $200,000 facility. That is a substantial burden. You know, here, there's nothing like that. The plaintiff was saying that they had made, I think it was $1.5 million a year, I believe. And so the burden, even if every state had an identical fee structure, and we don't know that because there's no evidence in the record as to other states' fee structures, but even assuming that that were true, this would be like less than 1% of the fees that they get from brokerage fees, not counting the fees that they take to put, to put them, put the property on their website and offer it for sale. And again, this offer for sale, the plaintiff says, well, we're really just advertising. And there, this is not just advertising. FSBO is just advertising. You know, the for sale by owner website, it gives the name of the person who's selling and it gives the sale price. You know, the plaintiff's website does not give that information. It's not, it's not, you know, the equivalent of a classified ad in a newspaper for a puppy where there's a phone number and the price of the puppy. This is only the gateway to getting the brokerage fees for, you know, from the person because you can't, the person who sees a, how, the timeshare that they might want can't go to the seller directly. It's not an advertisement. Can't go to the seller directly. What they do is they go to Stroman and ask about it. So again, this is an offer for sale. Does the record show what happens when they go to Stroman to ask about it? Well, I believe Mr. Stroman testified that they try to work it out with the buyer. They try to get a good price. And then once, once there's apparently some agreement, and this, you know, Powell can tell you better perhaps, but as I understand it, once there's an agreement about the price, then there's a commission agreement that is signed with the seller. And it, that's over and above the $500 fee for putting it on the web. When you say there's a commission agreement, is that already agreed to that there will be some commission? The plaintiff, the, a seller is told that there will be a commission of 10% or so, yeah, beforehand. I mean, they don't sign the commission agreement until there's actually a buyer in hand. But when they choose to accept the advertising services, that's when they're told that when we work things out for the sale of your timeshare, we will be charging a commission? Is that what you're saying? What I'm saying is they're told, as Mr. Humphreys testified to, and as Mr. Starman testified, what happens is they're told we will put your, we will put your timeshare up on our website with information about, you know, the particulars, the time, and how many bedrooms, and so on, blah, blah, blah. And then, and only once a buyer comes along and agrees to a price, and thus a commission would be triggered, is a commission agreement executed. Yes. You mentioned 10%. Is that the figure that was discussed, according to Mr. Humphreys? I believe so. Certainly Mr. Starman testified that this is the number that's usually achieved. So some caller responses, is there anything in the record, Cheryl, some caller called and said, give me the name and phone number of the donor so I can contact that person directly, if that would happen? There's no evidence to that effect, and I certainly doubt that that would happen. So it's plain from the evidence here that the only evidence of any burden is that it's the 7th Circuit said in the Strowman case, in the 7th Circuit, Strowman v. Martinez, when the plaintiff went there to try to get an injunction against the department proceeding, and the 7th Circuit recognized that, acknowledged, noticed that the burdens that the plaintiff was saying were on them, because they raised a Commerce Clause claim in that case as well, that those were only the sort of incidental benefits that come with going to providing services in another state, and thus are not the ones that would be so burdensome that they would clearly be excessive in relation to the benefits to the state from protecting consumers and regulating real property transactions in Illinois, transactions of real property that's located in Illinois. With regard to the First Amendment challenge as well, in Central Hudson, this is for commercial speech, and again, the speech we're talking about is the direct mail, there are only two forms of speech that are at issue here, the direct mail solicitation of Illinois residents and the offering for sale of property belonging to Illinois sellers or property physically located in Illinois. Those are the two forms of speech that are at issue here. Commercial speech is the speech that offers a transaction, and those are the two transactions. The direct mail says, we want you to buy our services, in that sense, and the offer for sale is obviously an offer to sell to the world of these timeshares. Again, only the timeshares that belong to people who live in Illinois or timeshares that are physically located in Illinois. Is there a substantial interest? Well, again, the Illinois Supreme Court has said that Illinois has a substantial interest in regulating the professions and especially the real estate profession, in particular, because again, it has a very real interest in regulating transactions of property that's located in Illinois. And so the question is, does the Act directly advance those interests? And the direct advancement test is whether it is either ineffective or does it have an effect that's not remote? And certainly, there is a direct correlation between regulating real estate brokerage and the act itself. And the state's interest in regulating the profession of real estate professionals. And so the question is, does it serve, is the act, could it be better served by other means? And the answer is no here, because if the plaintiff suggests, well, you could bring a plaintiff, an Illinois seller, an Illinois property, someone who owns a property in Illinois timeshare could just file a consumer fraud act. Well, again, given the resistance of plaintiff to this action of what it, when it did stuff in Illinois, and certainly acted in Illinois, I mean, that is not a good substitute for licensing someone who comes into Illinois and provides services to Illinois residents or for properties located in Illinois. And again, Texas regulators, they say, well, Texas regulators can do this. Texas regulators protect Texas consumers. Their interest is in protecting their own citizens and their own transactions. They have not nearly the interest that the Department has in regulating and protecting Illinois consumers and transactions in Illinois real property. Unless the Court has any questions? I don't see any at this time, Counselor. Okay. We would ask that you affirm, because just as, just as if I sold my condo, I would need a broker license in Illinois, so too does the Act regulate the work that the plaintiff does. Thank you. Thank you. Ms. Powell? Thank you, Your Honor. May it please the Court, Leslie Powell on behalf of Stroman Realty. There are at least three reasons why the agency decision was wrong and the Circuit Court was correct in reversing that decision. First, Illinois has a longstanding rule against extraterritorial enforcement of its laws. Second, requiring Stroman to obtain a license to advertise services that it performs elsewhere and advertising on the Internet violates the First Amendment and the application of Illinois laws to Stroman's activities violates the Commerce Clause. And if the Court will recall, the Administrative Law Judge found that Stroman's operations were conducted exclusively in Texas. To the extent the Court has any questions regarding whether or not these arguments were made before the Circuit Court or the agency, they in fact were. And I can refer the Court to the agency record at 824, 834, and 836. These arguments were made and they were, in fact, preserved to this Court. But, Your Honor, are you misconstruing that statement? I mean, I don't think there's any argument between the parties that if an Illinois person decides to accept services, that they are likely signing a contract in Illinois. Actually, no, Your Honor. We're not in agreement on that. Mr. Stroman's testimony was, it was probably. He didn't know. Right. That was my question. Isn't it likely that they're going to sign the agreement in Illinois? If it involves an Illinois resident and the Illinois resident is in Illinois, yes, the Illinois resident probably signs it in Illinois. However, the Illinois resident is not hiring Stroman to perform any service in Illinois. And that is a critical distinction. And the actually is germane. Because in that case, you had an Illinois lawyer who wanted to practice in the Indiana courts. And the court said, well, then you have to go take an Indiana license exam in order to do that. But what the court didn't do is say, oh, well, if you're going to represent Indiana residents in Illinois courts, you also have to go get an Indiana license. And that's exactly what the State is saying here. And it's a completely different circumstance. And so when somebody's performing a personal service contract, which the State agrees that this is, and it's not transferring an interest in land, and that is an important distinction, what you look at is where the service is being performed. And in fact, that's what the Seventh Circuit did in Paulson. And we cited that in our briefs. But there, they upheld a commission award to a broker for Wisconsin property for a Wisconsin resident, even though the broker didn't have a Wisconsin license. Because all the negotiations, all the activities involved in the brokering took place in Illinois. I believe it was Illinois. It wasn't in Wisconsin. And that actually matters. That makes a difference for this case. And I want to make one point before I forget it. There is nothing in the record that supports the statement that Texas is only interested in protecting Texans and that it doesn't have any interest in regulating its own licensees. That's not in the record before this Court. And in fact, that's not the case. Texas regulates Stroman, and Texas will consider complaints made by non-residents about Stroman. Is that in the record? No, but if you look at the Texas regulations, you will find that it's in the Texas law. No, I understand that. No, it is not in the record, Your Honor. As you pointed out about what's in the record in this case. No, and in this case, Your Honor, it is not. Let me go now to the suggestion that this case is only about $500 and a test. It's not. This case is about imposing Illinois regulations on out-of-state brokers in transactions that don't involve any Illinois residents at all. And what is in the record is that Stroman has Texas resident clients that own Illinois timeshares. And what Illinois is telling this Court is, is that Stroman cannot offer those Illinois timeshares for sale on behalf of its Texas resident clients unless it also has an Illinois license. What about the Humphreys? They're not Texans. That's true, Your Honor. They're Illinois residents. Why can't the Illinois Department have these regulations to protect their interests? Well, Your Honor, I would suggest to you that Illinois could have that if that person who was providing those services was in Illinois. But Mr. Humphreys testified very clearly at the agency proceeding that he did not hire Stroman to do anything in Illinois. Again, it goes back to where are those personal services being performed? So, Justice Inscariano, if you're going to represent an Indiana resident in an Illinois lawsuit, you better be licensed by Illinois. Well, the practice of law is entirely different. I find nothing helpful in that comparison. But I'm curious, your position is that as long as all of this occurred without anyone from Stroman coming into the state of Illinois, the state of Illinois has no interest? What I'm saying, Your Honor, is that if Illinois doesn't have the authority to regulate Stroman, it can't. But that begs the question. They have the authority to regulate Stroman according to the Attorney General's Office because they're dealing with offering a property for sale to Illinois residents. Well, I understand what you're saying, but Your Honor, if I could answer your question with another example. So, you have an Illinois resident who hires a Maryland broker to sell a Maryland beach condo. Using Illinois' rationale, that Maryland broker who's selling the Maryland beach condo now also has to have a license in Illinois. And that's not the law because that Illinois resident is not hiring that Maryland broker to do anything in Illinois. What that Illinois resident is hiring the Maryland broker to do is to engage in the transaction marketing that Maryland condo for sale. What if the Maryland broker sent a letter to the Illinois resident and said, I understand you own property in Maryland and I want to, if you're interested in selling it, I'm a great real estate broker and I'd be happy to do it for you. I think that's completely illegal, Your Honor. Well, with that, it's not question of legal. It does not trigger Illinois licensing requirements and it can't because it would violate the First Amendment if that were the case. Well, let's leave aside the First Amendment for the moment. I'm just talking about the sufficient connection aspect. No. No, it doesn't mean that Stroman is engaging in, or it would violate the Commerce Clause if that's how the statute is interpreted. Because that would be imposing Illinois law on a transaction that will ultimately take place entirely outside the state. And when you look at the Mills case that we cited in our briefs, that's what happened there. And so Illinois, it's escaping me right now, residents of one state went into the other state and said, I want a loan. And they said, okay, fine, give me your car keys, but by the way, we're going to record the existence of this lien with the MVA in your home state. That was a transaction that was still considered to have taken place completely outside the state that was trying to regulate Mills. Did Stroman solicit Illinois customers in Illinois who own timeshares in Illinois? There is no evidence in the record that that is the case, Your Honor. Isn't that what the ALJ found? No. That is not what the ALJ found. I want to make it clear, the ALJ did not find that while Stroman's operations may be exclusively conducted in Texas, Stroman solicited customers in Illinois and customers who own timeshares in Illinois? That is correct, but that is not the same as saying that they were Illinois residents. I'm sorry, Your Honor, I misheard you. I thought you said Illinois residents and owned property in Illinois. I thought you had a conjunction there. Her finding was an either or. It was Illinois residents or owners of Illinois timeshares. Okay. I understand. So there was no finding that it was an Illinois resident owning an Illinois timeshare. So had the Humphreys, who were Illinois residents, owned a timeshare in Illinois, then Stroman would have said, I'm sorry, I can't handle this for you because I'm not subject to Illinois regulations? Well, Your Honor, first, that isn't in the record, and so I would be speculating. I want to hear your analysis about the reach of the state. Could Stroman be subject to regulation under those circumstances? No, not necessarily. In the Paulson case, Your Honor, out of the Seventh Circuit, tells you why. Because even if you have an owner and a property in that state, and you hire a broker, I think in Paulson it was a Wisconsin property, a Wisconsin owner, and an Illinois broker. The broker's activities in negotiating the sale of that property took place in Illinois and Tennessee. And the commission, therefore, could be awarded in that case because the activities that he was hired to do took place outside the state of Wisconsin. And in fact, the court decided that the statute didn't reach that far, so it didn't have to reach the Commerce Clause question in that litigation. And so, no, Your Honor, it would not require that he turn down that opportunity. And when you look at timeshares, it is, and the testimony was unrebutted in the agency, that they are, by their very nature, interstate, particularly the timeshare resale market. Because you have buyers in one state, sellers in another state, timeshare in a third state, and it's very rare that you would have an owner and the timeshare located in the same state. Is the ALJ correct to find that Stroman's business involved not merely advertising, but listing timeshare properties for sale and offering them for sale? That is correct, but she didn't have the evidence to find that he was doing it in Illinois. Well, how about advertising in newspapers in Illinois that people like the Humphreys would read? So what happened in that case, Your Honor, was that Stroman advertised its services in USA Today, which is a nationally distributed newspaper. Mr. Humphrey saw it and he said, oh, I want to unload this timeshare, I've never used it, called Stroman up and said, can you help me? And there was back and forth, and then he called Stroman back. I mean, he didn't sign up for this program in that first conversation. And so, I beg your pardon, I just completely lost my mind. Well, he didn't sign up in the first conversation, but at some point he did. No, but he did sign up. No, he did. He did sign up and he authorized a charge in the credit card, and Stroman did exactly what it said it was going to do. So if I'm reading USA Today and I'm interested in buying a timeshare and I see this ad, wouldn't it suggest to me call Stroman? Absolutely, that's the point of the ad. And they're offering them for sale? Yes. If I called Stroman and I said, can you connect me with the owner because I want to talk to the owner about buying this, the answer would have been no. The broker will deal with it and handle the negotiations. Wouldn't that be the story? That would likely be the case. And none of this makes any difference because they're in Texas and the Humphreys are in Illinois, and it's a property located in Tennessee. And who knows where the caller came from? I mean, the caller could have been somebody in, well, I'm from Maryland, I'll use Maryland. It doesn't mean that that activity occurred within the state of Illinois or that it's appropriate for the state of Illinois to regulate that transaction because it is so inherently in the state. Well, to be clear about this, your position apparently is not then that Stroman was merely advertising properties. Stroman was advertising properties and, in effect, advertising brokerage arrangements for callers on behalf of the owners of the property. Wherever they may be. Wherever they may be. Through national publications and through the Internet. But that's more than just an advertising, isn't it? Well, first of all, the advertisements and the print ads and the direct mail were offers that said, you know, if you have a timeshare to sell or if you want to buy a timeshare, call Stroman. That's advertising, Your Honor. That's just advertising the service. So I don't think that counts. I have a timeshare I want to buy. I call Stroman. Will you give me the number of the person who owns timeshares in Gatlinburg? No. No, but, Your Honor, it's still not connected to Illinois. That's the point. Well, no. The first, I'm trying to take this in detail. Sure, I'm sorry. That's more than just advertising. Do you agree that they're doing more than just advertising? They're advertising, but then they're offering brokerage services for these people as well. They are offering brokerage services for the people as well from their location in Texas where they are fully regulated, yes. Potentially for property in Illinois. Well, there's no evidence in this case. They do that. On this record. Property anywhere. Well, yeah, they would do it for property anywhere. But, you know, once again, the suggestion that you have to have an Illinois license in order to do this is unnecessary because the purpose of the Illinois regulatory statutes is to protect Illinois residents. It's not to protect Illinois dirt. That's not what real estate brokerage services are. They are personal services contracts that relate to marketing. Okay, so that's point number one. So just because you have Illinois dirt doesn't really make any difference at all. And the Paulson case would also tell you that that's true. Now, what happens then is you look at, well, what are the requirements of the Texas licensing? And if you look at, I believe it was Respondents Exhibit 13 that was filed in the administrative action, it shows the educational requirements. Texas has some of the highest educational criteria in the nation. It's over three and a half times as much education as what this state requires. And so there's nothing, the state of Illinois did not put on a single bit of evidence to prove that there was some specific Illinois, you know, arcana that was required in order for Stroman to sell or broker the sale of Mr. Humphrey's Tennessee timeshare that made Illinois licensing appropriate or necessary or that it furthered any governmental interest. And when you get to the First Amendment analysis, that absolutely does matter because it has to be a less, are there less restrictive means of regulating? And the fact of the matter is, is that Texas is right there and Texas has the authority to regulate. And if Stroman did something really bad in Illinois, just as in Costal, which is relied on heavily by the state here, Stroman could be sued in Illinois. And I'd like to talk about Costal just for a minute. And this is important because the Costal case was a personal jurisdiction case. In Costal, what that case involved was the services by a Michigan pathologist who did a tissue assay of an Illinois resident. And the Illinois resident sued the Michigan pathologist in Illinois and the court said, yes, you have personal jurisdiction. That court didn't say, oh, Michigan pathologist, you can't assay Illinois resident's tissue unless you also have an Illinois medical license. That was not the holding in that case. And that's material. So it was fine for them to ship the tissue off to Michigan to be analyzed and for the Michigan pathologist to write the report. But that person who was claiming injury by the pathologist still had a right of redress in his home state. And that matters, too, because Costal also demonstrates that there is an ability for the injured party to sue in Illinois. And I would like to make it abundantly clear that there was not a shred of evidence that any of Stroman's advertisements were inaccurate or misleading. And in the circuit court, the agency conceded as such. I mean, Stroman's not some fly-by-night organization. I mean, in the five years prior to the agency action, Stroman brokered over $65 million worth of timeshares on the resale market. They provided a much-needed service in a very underserved market. Let me ask you another question. Yes, sir. With regard to the commission agreements, if the call is received by Stroman concerning a timeshare in Tennessee and the Illinois resident is the person who, the Humphreys in this case. Now, it turns out that, if I understand correctly, the Humphreys never got any bite at the apple. They were unhappy about it. But let's assume that there was someone who was interested and that the Humphreys then signed. They have an interested seller and Stroman says, now we have this and they want to buy it for $100,000 and we have this commission agreement that we told you about and now we want you to sign that and pay us our fee. That clearly would be signing a contract with an Illinois resident based upon an event now occurring in the state of Illinois where the Illinois resident pursued it through an ad that Stroman placed. Is it your position that at that point there's still insufficient contact with Illinois to justify regulating that aspect of what's going on? Yes, under Paulson that would be the case, Your Honor. Under what? Under Paulson that would be the case. By the way, I should mention, all decisions of all courts are entitled to respect, but none of them are binding upon us except for the Illinois Supreme Court and the U.S. Supreme Court. I recognize that. So when you say under Paulson, that's just the first step. Under Paulson, and the reasoning is so sound in Paulson because it's the second step. Okay. Well, I'd like to get to the second step, Your Honor. Please. Well, counsel, you're actually out of time. Could I have your interview? Yeah, I'd like that if you would. Thank you. Go right ahead. Thank you. Thank you very much, Your Honor. The reason that is the case, Your Honor, again, because it goes to where the services were provided by the broker, it's because those services, the negotiation for the sale, those efforts didn't occur in Illinois. They occurred throughout, frankly, throughout the world. That offering took place throughout that. If I accept your distinction, okay, the offer wasn't enough, but the signing of the commission, why would that be enough? Because the commission is payment for the services, Your Honor. The commission is what? The commission is the payment for the services, for the negotiation, for getting it sold. And so it would be governed by the state where the service provider was, Justice Inscariano, where the Illinois lawyer was governed by Illinois law. Thank you. Thank you very much. Thank you. Thank you. It's true that the central question here is where are the services provided? The agency found that the services were provided in Illinois, that the solicitation occurred in Illinois  And that's consistent with COSTEL, which said when you're a nationwide service provider and you provide services to an Illinois resident, you provide those services in Illinois. And that's the same thing with QuickPay. It's also the same thing with the Minnesota Supreme Court, because their reasoning is really good. Because there's a big difference between if the Humphreys had gone to Texas and asked Stroman to, you know, to broker their timeshare, we would not be saying that that needs to be, that's not this case. What happens here is that Stroman sends direct mail solicitation to Illinois residents or for owners of Illinois timeshares to offer its services. And it also offers services, provides those services to Illinois residents and for Illinois properties. And when you provide services to an Illinois resident and you put yourself out as a nationwide service provider, you are providing those services nationwide, not just in Texas. Ms. Wells drew a distinction between offering for services to people in Illinois and offering Illinois properties to people in Illinois. What about that? Wait, well, there are two groups of sellers here that Illinois has the right to regulate for brokerage services to. One is Illinois residents who own timeshares, wherever those timeshares might be. The other is Illinois timeshares that are located in Illinois, which are no different from everybody's house in Springfield, everybody's house in Chicago, everybody's house in Illinois. When you are selling a real property, when you are brokering, offering your brokerage services for real property in Illinois, Illinois has the right, the duty to regulate those because you want competence in Illinois real property law. And only Illinois regulation guarantees that. That's why there's an Illinois exam because that guarantees competence in Illinois real property law and transactions in real property that exists in Illinois. So, again, there's a huge difference between the Mills case, which is the case where the Indiana person goes into Illinois and where it deals with an Illinois lender who has no physical presence in Indiana. Again, the Indiana resident voluntarily goes to another state, to Illinois. And because the Indiana resident goes out of his own state to seek services, that's why Indiana can't regulate those services because the Indiana resident, in effect, voluntarily gave up the protection of the state. Well, let me go back to the situation where we're dealing with Ronald Humphreys as an example. That property wasn't located in Illinois. Correct. So the real estate act wouldn't apply to that. We don't have to worry about protecting Illinois property. So the claim is that because the people are Illinois residents, that's enough? Right, because they are physically in Illinois, and because they don't physically go to another state to seek that other service provider's services. Just as in Costill, the Illinois residents didn't go to Michigan and say, please give us your services. The Michigan provider of services in Costill said, we are a nationwide service provider and we are providing our services everywhere. And because they said that, because they, in fact, did that, the Illinois appellate court found that they were providing their services in Illinois. And so even though the lab was in Michigan, the doctors were in Michigan, everybody was in Michigan. And so their operations, just as Stroman's operations are in Texas, that Michigan lab's operations were in Michigan, but they provided services in Illinois. And that's the difference. Where you actually have your operations is not necessarily where you provide your services. I think that's the huge distinction. If Stroman had offices in Arizona and Montana, would the Arizona and Montana agencies have the same basis as Illinois does to claim that they are subject to those states' timeshare acts? Yes. If they were a resident of those states, yes. Yes, they would. Because they, I mean, yes. Because they, yes. Does that make good sense? Well, I think anywhere where a business opens up a base of operations, they have to be expected. They must expect to be regulated. Or changing it slightly, if the Humphreys lived in Arizona or Montana, would those states have authority, as Illinois claims to, to regulate timeshares? If the Humphreys lived there instead of Illinois? Yes. The only thing I want to change, the Humphreys live in Montana. Oh, yes. Everything else is the same. Does Montana have the authority to claim that Stroman's subject to the Montana timeshare act? No. I mean, if, you know, if Stroman had no people, well, if Stroman had no people in Illinois for whom it was, or for which, there were five, actually, they listed, they offered for sale at least five timeshares for five different resorts. So there was, in fact, evidence in the record that they were offered for sale Illinois real properties. But if there were, if there were no relationship between a seller or the real property in Illinois, Illinois wouldn't regulate. But there are other options. Let's assume Stroman had no Illinois timeshares for sale. Does the Illinois timeshare act, under the facts of this case, still govern Stroman? Yes, because it governs people like Humphreys who receive services. But then why, going back to the question I just asked, Arizona and Montana. Stroman's got no timeshares for sale in Montana, but the Humphreys happened to live there when they called Stroman. Is Montana, are they subject to the Montana timeshare act? Well, rather than Illinois, with regard to the Humphreys in particular, yes. I mean, because if the Humphreys had no, if the seller, whoever it is, has no connection with Indiana, then certainly Illinois wouldn't need to regulate that transaction. If the seller wasn't related to Illinois and the property wasn't located in Illinois, then Illinois wouldn't have an interest in regulating the broker of that transaction that's happening completely separate from Illinois. But when you have an Illinois person who is receiving the services, again, you know, that person isn't going out of state like the borrower in Mills. You know, that there's a change. I'm sorry, and I apologize to my colleagues. I want to make sure I understand your position. You're changing facts. I don't want you to change the other facts. I'm sorry. Okay. I want the Humphreys, two facts only change. The Humphreys are residents of Montana. Right. And Stroman has no Montana timeshares listed. So everything else is the same, only you're now representing the state of Montana. Does Montana have a good claim to subject Stroman to the Montana Timeshare Act? Yes, for the same reason that Illinois does. And so would Arizona if there are no timeshares in Arizona and the Humphreys lived in Arizona. Correct. Yes, because they're providing services to the seller wherever the seller is physically located. Again, it's the physical location of the seller that matters. The physical location, well, the physical location of the seller or the physical location of the property. Well, then it wouldn't matter. Both. So then the claim of the department that, by the way, Stroman's got property for sale, timeshares for sale in Illinois, doesn't matter to your claim. No, it matters for both. I'm saying that both of those two groups are regulatable because both have the seller, because the seller is physically located in the state that wants to regulate wherever that seller might be, and the property itself, wherever that property might be. Whatever state has the relationship to the recipient of the services or the physical property that's at issue, that state has the right to regulate. Thank you, counsel. We'll take this matter under advisement. Thank you. Thank you.